Staples, J.,
delivered the opinion of the court:
"Whatever may be the diversity of opinion in to the validity of acts done under the authority of the confederate government, there is one proposition, eertainly, as to which the courts are now generally agreed: that is, that the late war between the two sections was a civil war in the most literal and comprehensive sense of the term, and was attended by all the incidents and consequences of a war between independent nations. Having no common superior to judge between them, the two sections stood precisely in the same predicament as two nations who engage in contest and have recourse to arms. Numerous eases in the state courts might be cited in support of these propositions; but it is unnecessary. A reference to some of the decisions made by the supreme court the United States will be conceded by all as sufficient for that purpose. In Brown v. Hiatts, 15 Wall. U. S. R. 177, Mr. Justice Field said: It is unnecessary to go at length over the grounds upon which this court has repeatedly held that the statutes of limitation the several states did not run against the right of action of parties during the continuance of the civil war. It is sufficient to state, that the war was accompanied by the general incidents of war between independent nations; that the inhabitants of the Confederate States, on the one hand, and of the loyal states, on the other, became thereby reciprocally enemies to each other, and were liable to be so treated, without reference to their individual dispositions or opinions; that during its continuance all commercial intercourse and correspondence between them were interdicted by principles of public law, as well as by express enactments of congress; that all contracts previously made *516 between them were suspended; and that the courts of each belligerent were closed to the citizens of the See opinion of Judge Joynes, in Billgerry v. Branch & Sons, 19 Gratt. 393, 417, and cases cited.
The prohibition here alluded to by Mr. Justice Field, it has been held in numerous cases, affected debtors and creditors on either side equally with those who did not bear that relation; so that the transmission or payment of money for any purpose was utterly forbidden. It was unlawful for the debtor to pay, it was unlawful for the creditor to receive. It was unlawful for them to have any intercourse, communication, or correspondence, whatever, upon any subject or for any purpose. The operation of the contract during the war was as completely suspended as though it had never had any existence. In the language of the supreme court of New York in the famous ease of Griswold v. Waddington, 16 John R. 438, the idea that any remission of money may be lawfully made to an enemy is repugnant to.the very rights of war, which require the subjects of one country to seize the effects of the subjects of the other. The law that forbids intercourse and trade must equally forbid remittances and payment.
Ho one familiar with the history of the struggle between the two sections, and with the decisions of the courts since its close, will hesitate to apply these rules in all their stringency, to the respective belligerents after the date of the president’s proclamation of the 2nd August 1861.
Applying these principles to the case in hand, it follows, that the appellee, residing within the confederate lines of occupation, could not lawfully pay the appellant residing within the federal lines. He was positively interdicted from making such payment by the *517 laws of his country and the laws of nations. How then could the trust deed be enforced. A sale under that deed was founded upon the supposed default the debtor. But there can be no default, when the debtor is prohibited from paying and the creditor from receiving. In this connection I cannot do better than to give an extract from the opinion of an enlightened federal judge. In the Kanawha Coal Company v. Ohio Coal Company, 7 Blatch. Cir. C. R. 891, 408, Judge Blatchford uses this language: The enforcement (of the debt) was indeed not by a judgment that the debtor personally pay the debt to the creditor, but was by a sale of land which the debtor had specifically put in trust to pay the debt. Nevertheless the foundation of the proceeding was that the debt existed and the debtor had not discharged it. The duties and rights of the creditor were correlative. The right which the creditor undertook to exercise by enforcing a sale of the land, was to compel the discharge of the debt in invitum by that means, so far as the proceeds of sale would go. This right could not exist in favor of the creditor unless there existed at the same time a corresponding duty and capacity on the part of the debtor to pay the debt to the creditor. The right of action that is suspended must include the right to resort to any species of proceedings, judicial or otherwise, to enforce the contract.
These positions of the learned judge are supported by a number of cases cited in his opinion, and by a force of reasoning which appears to be unanswerable.
The supreme court of the United States has, however, decided differently. In the case of “ University v. Finch ” 18 Wall. U. S. R. 106, that court held that a sale was valid made by a trustee during the war under a trust deed executed before; the creditor being a *518 resident of Missouri, and the debtor a resident of Yirgiuia. Mr. Justice Miller, in delivering the opinion the court, maintained, that even the enforced absenee 0f the debtor afforded no sufficient reason for arresting his agent and the agent of the creditor in performing a duty which both of them imposed upon him before the war began. His power over the subject was perfect; its exercise required no intercourse, commercial or otherwise.
The learned justice loses sight of the principle that the deed of trust is a mere security for the debt, and that the authority of the trustee to sell results only from the default of the debtor. Ho one will maintain that the creditor could enforce a sale of his debtor’s property while the latter-is prohibited by injunction or process of garnishment from making the payment. The prohibition arising from a state of war is much more stringent: for in the latter case the debtor is not only forbidden by positive law, but by the highest obligations of duty and patriotism from holding any communication with his creditor. The injustice of selling the property of the debtor to satisfy a debt which he is prohibited by law from paying, is too palpable to admit of justification. The debtor’s right to redeem his estate is commensurate with that of the creditor to make the sale. If the one is suspended, justice and reason require that the other shall not be exercised.
The learned judge felt the force of these difficulties in, University v. Finch. He answered them, or attempted to do so, by declaring that the effect of the proposition was to give immunity to rebels against the government not accorded to the soldier who is fighting for that government; its tendency is to make the very debts which the citizens of one section may owe *519 to another an inducement to revolution and insurrection; and it rewards the man who lifts his hand against his government by protection to his property which would not otherwise possess, if he can raise his efforts to the dignity of a civil war. It is very obvious that the learned judge is disposed to make a wide distinction between the case of a “ rebel debtor in the insurrectionary states” and “a loyal debtor in the loyal states.” If the position of the parties in University v. Finch had been reversed, and the estate of a loyal debtor had been sold, the argument of the learned judge must of necessity have been very different. Ho authority is cited for this supposed distinction between the rights and privileges and exemptions, during the war, of those adhering to the federal government and those siding with the confederate government. The writers on the laws of nations utterly repudiate any such distinction. Those writers universally declare, that in a civil war the parties, having no common superior to judge between them, stand precisely as two independent nations who engage in a contest and have recourse to arms. Who shall judge between them; who shall pronounce on which side the right or the wrong lies. On earth they have no common superior. Vattel’s Law of Hations.
But as I have already said, the supreme court of the United States itself has again and again decided that the late conflict was a war, in the legal sense, with all the incidents and consequences of an international war; and that in order to determine how the contracts, rights and obligations of citizens were affected by that war, recourse must be had to the general principles applicable to a state of war between nations. According to these principles the very same privileges, disabilities and exemptions attached to the debtor re *520 siding in the South during the war as to the debtor resident in the northern section. It was equally unfor the former as the latter to make any transmission of money to his enemy creditor, or to hold any communication whatever with him. And when the southern debtor seeks to avail himself of this universally acknowledged principle, he is told that his proposition gives immunity to rebels not accorded to the loyal soldier; and that its tendency is to make the very debts which the citizens of one section may owe to another an inducement to revolution and insurrection.
Whatever may be the motives of a people in going to war, even if they be so paltry as the non-payment of a few years interest upon their debts, these motives are not the subject of inquiry with the courts in adjudicating the contracts of citizens as affected by that war. The political department, the treaty-making power, may deal with the causes of the war, with a view to indemnity and security, but the courts have no concern with them. It is sufficient for them that the contest was waged—that it assumed the magnitude and proportions of a civil war, and was so treated by the legislative and executive departments. It cannot but excite astonishment that when the validity of the blockade was to be maintained, or a right to capture private property was asserted, doctrines were announced the effect of which was to invest the Confederate States with the powers and rights of belligerent sovereignties; but when the rights of loyal citizens of the North are involved in controversies with citizens of the South, the people of the Confederate States are denounced as traitors, escaping the just punishment of their crimes only through the clemency of a magnanimous government. Spotts v. United States, 20 Wall. U. *521 S. R. 459; Mrs. Alexander’s Cotton. Speaking for myself only, upon this and questions of a kindred character, I feel under no obligation to follow the of any tribunal, unless they accord with my own convictions of the rights and obligations growing out the struggle through which the country has passed.
It has been argued, however, that the principles here involved have no application whatever to the case of a debtor who voluntarily left his home during the war, for the purpose of residing within the confederate lines; thereby, by his own act, disabling himself from performing his contract. The cases of Dean v. Nelson, 10 Wall. U. S. R. 158, and Ludlow v. Ramsey, 11 Wall. U. S. R. 581, are relied on in support of this proposition. Those cases certainly establish the distinction between the case of a debtor who voluntarily left his residence in the North, for the purpose of engaging in hostilities against the federal government, and a debtor who was expelled by military force and forbidden to return. In the one case, it was held, the party is bound by judicial proceedings against him in his absence; and in the other it was held, that he was in no wise bound.
Row there may be cases in which a debtor, voluntarily abandoning his home and going into the opposing lines, cannot claim the benefit of the rule as applied to actual residents. The present is, however, not one of them, as will be hereafter seen. But, I submit, the mere fact of such voluntary abandonment is not of itself sufficient to deprive the debtor of the benefit of the rule. In the first place, it is very difficult now to determine what constituted a voluntary abandonment of home in the case of a citizen who fled from one section to the other. Thousands of persons, being in the northern states, and suspected of southern sympa *522 thies, were expelled from their homes, not by military , force, but by that which was far more terrible and the fire and passion of mighty mobs, aroused to the highest exasperation by the attack upon Sumpter, and, as they conceived, by an unjustifiable rebellion. These persons were liable at any moment to popular violence. They were perpetually subject to a system of espionage, annoying and degrading in the extreme; and they were in constant apprehension and danger of arrest and confinement in dungeons, beyond the reach of the courts of law. To some extent this condition, of things existed in some of the south-states with reference to persons of northern proclivities. Nine-tenths of those who abandoned their homes at the commencement of the struggle did so under the most powerful motives and inducements-that could • animate the human heart. There were many who fled in sudden alarm when the storm broke in its fury, without any fixed intention except to escape the dangers that surrounded them, and who had no conception of the magnitude and duration of' the struggle,'and who were never able to return in safety.
Again, as the war progressed, the federal armies extended tbeir conquests from state to state, acquiring firm possession as they advanced; in many instances the terrified inhabitants fleeing before them, and taking refuge still further within the confederate lines. Henceforth such territory would be enemy territory, and the creditor and debtor be regarded as enemies.
Every one can see the injustice of applying to persons thus situated, and thus acting, the rule laid down by the supreme court of the United States in the cases-cited. It cannot be justly said of these men that they voluntarily removed from the one section to the other. *523 But if it can be so said; if the abandonment of residence and home was voluntary, does it follow a different rule is to be applied to them? The doctrine I to be well settled, that upon the breaking out of a civil war every man is permitted (in the language of Mr. Justice McKean) to choose his party. It was so held in Respublica v. Chapman, 1 Dall. R. 58-58; in Jackson v. White, 20 John. R. 313. In Inglis v. Trustees of the Sailors’ Snug Harbour, 3 Peters R. 99, it was decided that the right of election must necessarily exist in all revolutions like ours, and is so well established by adjudged cases, it was unnecessary to enter into any examination of the authorities. The only difficulty that could arise was to determine the time when the election should have been made.
This right of election was freely exercised during the revolutionary war, and was universally conceded. The doctrine of the English courts was, that American antenati, by remaining in this country after the treaty of peace of 1783, lost their character of British subjects. On the other hand, the American courts adopted the declaration of independence as the period for determining the status of the citizen as a subject; and it was held that a person born here, but who left the country before the declaration of independence and never returned, thereby lost the character of an American citizen. It will be perceived that neither the English nor American courts confined the right of election to a period anterior to the commencement of the war.
In the late struggle it is well known that as late as the battle of Bull Bun, vast numbers changed their residences from one section to the other, as a sense of duty, inclination or necessity suggested. And none exercised this privilege more freely than officers of the *524 government, officers of the army and navy; and their right to do so was not questioned at Washington. In-it was considered safer for the federal government and for individuals themselves, that they should take this course. Henceforth these persons, officers, and private citizens, became by the laws of war, enemies of the government of the United States, and of all who adhered to it. I can see no just reason why all these men thus treated as enemies, should not be entitled to the same exemptions, and stand precisely in the same predicament with those who happened to be resident here at the commencement of the struggle.
If, in determining the status, rights, and liabilities of the citizen we are to look exclusively to the beginning of the war, we encounter numerous and perplexing questions. As is well known, and as has been judicially determined, the war did not begin, nor did it close, at the same time in all the states. In the case of “The Protector12 Wall. U. S. R. 700, the supreme court of the United States held that the proclamation of the 27th April 1861, declaring a blockade, must be taken as ascertaining the commencement of the war in Virginia. But in a more recent case, Matthews v. McStea, 20 Wall. U. S. R. 646, the same court has decided that the blockade proclamations did not contemplate a cessation of all intercourse and business relations between citizens of the different sections. The only interference intended was such as might arise from the blockade itself; and the whole purpose as announced, was inconsistent with the idea that the people of the south were at that date to be regarded as public enemies.
The proclamation of the 27th August 1861, it would seem, is now regarded as the one establishing absolute non-intercourse, and the cessation of all business rela *525 tions. Are we to look to the 27th of April 1861 as the commencement of the war, as the period after which there could be no voluntary change of in the sense of the rule laid down by the supreme court? or must we take the 27th August 1861 as the period of non-intercourse? or the ratification of the ordinance of secession by the people of Virginia? or must we take the date of the battle of Manassas as the period and the event, which more effectually terminated friendly intercourse and communication.
Instead of attempting to lay down a rule, dependent upon inquiries of this sort, it is better to adhere to those fixed principles which define the rights and liabilities of parties as affected by the existence of war, without perplexing investigations into the causes of the war, or the manner in which the relation of enemies was acquired. As the creditor is forbid to receive, and the debtor to pay by a sdpreme power, each is therefore relieved from all the penalties, forfeitures and damages incident to the non-enforcement and the non-performance of the contract, and that, too, without regard to the particular circumstances under which they were placed in the attitude of enemies each to the other. If we hold it is the duty of the citizen to obey the laws of the government under which he lives, and to have no communication with its enemies, obedience to that law ought not to impose upon him the loss or sacrifice of his property. This rule accords with the dictates of an enlightened public policy, and with humanity and justice. In support of these views, there is abundant authority found in the opinion of Judge Blatehford, already cited, and in an able and interesting article published in the 14th vol. of Am. Law Reg., page 129.
It will be understood, of course, that these rules *526 have no application to a party who abandoned his section with a view to the non-performance of his conHor do I mean to affirm that it will apply to every case which a debtor, even without such intention, changed his residence after the commencement of the war. Whatever may be the exceptions to the rule, the present case is not one of them.
The appellee is a German by birth, and is now perhaps seventy-five years of age. It is not very clear as to the precise date of his abandoning his home in Alexandria county. It was certainly not later than the 1st of June 1861, and was, of course, long before the non-intercourse acts and the proclamation based thereon. What was his precise motive in thus coming within the confederate lines does not appear. His residence was in the midst of the federal troops, and it is easy to understand his apprehension of the annoyances and dangers to which he was hourly exposed. According to his own statement, he afterwards made an attempt, on several occasions, to return to his home, but was unable to do so. It is probable he might have done so by taking an oath of allegiance; whether he could have remained there in safety is another question. However that may be, whether he could or could not have returned, it may be reasonably supposed he had no apprehension of a sale under the trust deed at the time it was made, as there was then in force a statute passed by the Alexandria legislature prohibiing- sales of property under trust deeds for debt. This court has never decided that such legislation in time of actual war is unconstitutional; nor is it necessary now to pass upon that question. The existence of such a law, in connection with the other facts, was well calculated to cast a cloud over the title, and to lead to ■a sacrifice of the property. The sale was made notin *527 Alexandria, nor even in the state, but in the District •of Columbia. It is very true the deed does not prescribe the place of sale, and much was therefore to the discretion of the trustee. In the exercise of that discretion, it would seem clear that the sale ought certainly to have been at least in the county where the property was situated, more particularly as at that time access to Georgetown was rendered more difficult by the presence of the military and by the requirement of permits for persons resident in the county of Alexandria. As might have been expected, at a sale made under such circumstances, the property commanded a price considerably below its real value. The purchase was made by a married woman, the niece of the creditor, and a member of his family; the trustee being also a son-in-law. All the facts and circumstances tend strongly to show that the sale was a family arrangement, made exclusively in the interest of the creditor. The appellant was no doubt cognizant of all the facts as he was present at the sale, and was then apprized of the absence and place of the appellee’s then residence. He can therefore occupy no higher ground than the parties under whom he derives title.
Under all the circumstances, I think there was no error in the decree of the county court vacating the sale, and no error in the decree of the circuit court affirming the decree of the county court.
These views equally apply to the question of interest during the war. Interest is paid for the use or forbearance of money. There can of course, be no forbearance where the creditor cannot compel the payment of the principal, and where the debtor is prohibited by law from paying. During the period of such prohibition no interest can be exacted. See Hoare v. Allen, 2 Dallas R. 102. The circuit court *528 therefore committed no error in abating interest durmg the War.
The only remaining enquiry is whether the appellant is entitled to compensation for such permanent improvements as he may have made on the land, before the claim of the appellee was asserted. The circuit court was of opinion that the appellant was entitled to such compensation, but not to exceed the value of the rents and profits of the land. In this respect the decree is erroneous to the prejudice of the appellant. The appellant made his purchase in January 1865, took possession of the land at once, and has remained in possession ever since. Between the date of his purchase and the year 1870, he made permanent improvements in the full conviction that his title was good. During all this time the appellee asserted no claim to the land; nor did he in any manner notify the appellant of his purpose to contest the title of the latter. Although this silence is not sufficient to affect the appellees right of recovery, it is sufficient under the circumstances, to give the appellant a strong equitable claim to compensation for the full value of his improvements. On this ground the decree of the circuit court must be reversed, and the cause remanded, that an account may be taken, in which the appellant is to be charged with a reasonable rent for the use and occupation of the land during the time he has had possession; and he is to be allowed reasonable compensation for such improvements of a permanent character as he may have made, which have given an increased value to the land.
The decree was as follows :
The court is of opinion, for reasons stated in writing, *529 and filed with the record, that the circuit court did not err in holding that the sale of the appellee, Beauchler’s land, made on the 11th October 1864, was not valid execution of the trust, and that the parties claiming under such sale acquired no valid title to the said land. Nor did the said court err in holding that the appellee, Beauchler, is entitled to an abatement of the interest upon the debt secured by the said deed during the existence of the war. The court is further of opinion that the appellant is entitled to compensation for such permanent improvements as he may have made upon the land before notice of the appellee, Beauchler’s claim, although it may he in excess of the rents and profits for which the appellant is liable. Therefore it is decreed and ordered, that so much of the decree of the said circuit court as is in conflict with this decree be reversed and annulled, and the residue thereof affirmed, and that the appellant and appellees pay the costs by them incurred respectively. in the prosecution and defence of this appeal aforesaid here. And it is further decreed and ordered that the same be remanded to the circuit court, with instructions that an account be taken, on which the appellant is to be charged with the rental value of the land, exclusive of his permanent improvements during the time he had possession, and credited with the value of such permanent improvements as he may have made before notice of the appellee, Beauchler’s claim, and a decree rendered for or against him, as the case may be, for any balance which may appear to be due. Which is ordered to be certified to the said circuit court of Alexandria county.
Decree reversed.